**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

BRUCE OAKELEY,

      Plaintiff,

v.                                                             Civ. No. 1:20-cv-00257 MIS/KK

NEW MEXICO DEPARTMENT
OF TRANSPORTATION,

      Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

THIS MATTER comes before the Court on Defendant New Mexico Department of Transportation's ("NMDOT") Motion for Summary Judgment. ECF No. 34. Plaintiff filed a Response, and Defendant filed a Reply. ECF Nos. 39, 42. For the reasons that follow, the Court grants summary judgment on Plaintiff's sole federal claim and remands his remaining claim to state court.

**BACKGROUND**

Plaintiff filed suit in the Second Judicial District Court of Bernalillo County on December 17, 2020, alleging retaliation in violation of the New Mexico Whistleblower Protection Act ("WPA"), N.M. Stat. § 10-16C-3, and the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2615(a). ECF No. 1-1. Defendant removed the action on March 20, 2020. ECF No. 1.

The suit arises out of Plaintiff's termination from his position as Chief Information Officer ("CIO") of the NMDOT's Information Technology ("IT") Division. At the time of his termination on October 31, 2019, Plaintiff had been employed by the NMDOT since

March 2007. Undisputed Material Fact ("UMF") 1.[1] Plaintiff was promoted to CIO in July 2016. UMF 2. As CIO, Plaintiff's self-described job duties included managing "all IT budgets" and "90 technical and operations staff" as well as overseeing various other departments. UMF 3; ECF No. 34-3 at 1. Plaintiff's direct supervisor from April 21, 2018, through December 29, 2018, was former NMDOT Cabinet Secretary Tom Church. UMF 4. His direct supervisor from January 1, 2019, until the date of his termination was current NMDOT Cabinet Secretary Michael Sandoval. *Id*.

### **Whistleblowing Activity**

Plaintiff's whistleblowing claim is premised on a series of emails exchanged between Plaintiff; Plaintiff's supervisee, Gavin Lujan; Inspector General Jeff Canney of the NMDOT Office of Inspector General ("OIG"); and Human Resources ("HR") Director Gilbert Archuleta. Plaintiff alleges that his emails constituted protected whistleblowing because they communicated "Plaintiff's good faith belief that unethical and illegal conduct was occurring." ECF No. 1-1 at ¶ 24.

On May 17, 2018, the OIG's Audit Division released a list of planned and routine audits scheduled from October 1, 2018, through September 30, 2019, which included a statewide review of random employees' timesheets to survey the NMDOT's use of overtime ("OT") and compensatory time ("CT"). UMF 50. In the course of this planned audit, Michael Lucero, an IT employee, was randomly selected and his OT/CT documents requested. ECF No. 34-11 at 5–6. Mr. Lujan responded to the request by informing the

---

[1] Citations to Undisputed Material Facts, or "UMFs," refer to the Statement of Undisputed Material Facts in Defendant's Memorandum in Support of its Motion for Summary Judgment. ECF No. 34 at 3–15.

OIG that although Michael Lucero was "under" IT, he reported directly to Charles Remkes at Intelligent Transportation Systems ("ITS"). *Id*. at 5.

On April 11, 2019, Mr. Lujan sent an email to Mr. Canney, copying Plaintiff and Mr. Archuleta. He observed that the timesheets of two ITS employees, Michael Lucero and Lisa Lopez, "consistently show several hours of standby as well as extra hours worked." *Id*. Mr. Lujan suggested expanding the OT/CT audit "to provide more clarity on the situation." *Id*. On April 17, 2019, Plaintiff replied with his own follow-up message addressed to Mr. Canney, expressing his concern about the apparently unauthorized hours, totaling $50,000 to $60,000 in paid OT, "because this comes out of my budget." *Id*. at 3–4. Mr. Archuleta responded that Mr. Canney was "no longer looking into the OT hours issue at the ITS unit" because he considered it to be a management issue that would not require the OIG's involvement. *Id*. at 3. Plaintiff responded: "Jeff are you sure this is your position? I think we need to hear from you on this as well . . [.] I thought you handled waste fraud and abuse? If I'm not correct let me know." *Id*.

Two days later, on April 19, 2019, Mr. Canney responded, copying Secretary Sandoval. He explained that Mr. Archuleta had been mistaken; the OIG was continuing with its audit, although Mr. Lujan's request "include[d] issues of budget, management and policy." *Id*. Mr. Canney stated that he was prepared to discuss his findings with "agency leadership and/or whomever ITS reports to," but added: "To discuss this with you [Plaintiff] creates an appearance of a conflict for us both, as you don't oversee the management of ITS . . . The on-going friction between IT and ITS only complicates my concern." *Id*.

On the same day, Plaintiff responded:

As stated below those monies come from my IT budget and it affects my ability to manage those dollars that I cannot account for or justify. I don't feel there is a conflict between ITS and IT. I feel the IT portion has been miss-managed over the years and overtime, standby time and holiday pay has been abused not to mention ITS not following IT policy in general. Therefore, this is why Mr. Gavin Lujan looked into further and pointed these inconsistencies out to you at the prompting of your Overtime and Comp time audit.

We all have a fiduciary/moral responsibility to report finding such as these to the OIG correct me if I'm wrong? Based on your response below I am not clear what your function(OIG) Fraud, Waste and Abuse moto [sic] stands for and what purpose that serves. Maybe it needs to be revised or further clarified and or abolished?

Additionally, all NMDOT staff has received training and signed the annual acknowledgement regarding responsibility to report any sort of misuse or abuse of state resources as well adhere to all NMDOT AD's and directives and more so to SPO rules regarding Fraud, Waste and Abusee and overall State Policy. Please again correct me if I am wrong?

*Id*. at 2.

Secretary Sandoval joined the conversation for the first time in response to Plaintiff's message, stating that "the tone of your email is inappropriate" and that he "expect[ed] a much higher level of professionalism from any DOT employee, especially a high lever [sic] manager such as the CIO of a large department."  *Id*. at 1. Secretary Sandoval explained that Plaintiff was not entitled to information about the investigation, but that if he felt the issue was being handled incorrectly he could elevate it to Secretary Sandoval "in a PROFESSIONAL manner." *Id*. at 2. Plaintiff interpreted this email as "scathing," ECF No. 34-2 at 10, 145:25, and replied that he would "cease and desist all communication internally regarding this matter." ECF No. 34-11 at 1. However, Plaintiff

4

maintains that he acted as a whistleblower in his prior two emails by reporting "fraud and waste," and that he was subsequently retaliated against as described herein. ECF No. 39 at 17.

**Travel Voucher Tip and Investigation**

On June 26, 2019, approximately two months after Plaintiff's alleged whistleblowing took place, the OIG received an anonymous complaint that Plaintiff had not been following NMDOT policies and procedures related to out-of-state travel. UMF 9. OIG investigator Allen Sanchez was assigned to the complaint, and the investigation began that day. UMF 11;[2] ECF No. 42-1 at ¶¶ 6, 7. Plaintiff was placed on paid administrative leave pending the outcome of the investigation. ECF No. 34-7. Mr. Sanchez interviewed four employees (including Plaintiff) and reviewed hundreds of travel invoices, receipts, and other documents. ECF No. 42-1 at ¶ 7. He concluded that, in October 2018, Plaintiff had deliberately misrepresented his travel itineraries in order to receive excess reimbursement. *Id*. at ¶ 17. On August 14, 2019, Mr. Sanchez submitted a 34-page OIG Report to Secretary Sandoval and Employee Relations Manager Geri Galvan, attaching all invoices and receipts and setting forth his findings. *Id*. at ¶¶ 9, 10.

The basis for the investigation and subsequent findings was as follows. In the fall of 2018, Plaintiff presented itineraries and vouchers for two back-to-back out-of-state trips

---

[2] Although Plaintiff purports to "deny" UMF 11, his denial is nonresponsive to Defendant's statement and presents no genuine dispute of material fact. Plaintiff's assertions that "Investigator Sanchez had been fired from the Las Vegas Police Department" and "Plaintiff did not believe Sanchez was competent to be an investigator," ECF No. 39 at 2–3, even if true, have no bearing on whether Mr. Sanchez was assigned to investigate or when that investigation commenced. Defendant's UMF 11 is supported by evidence and, in the absence of any meaningful dispute, the Court takes it as true. *See* D.N.M.LR-Civ. 56.1(b) (when disputing material facts on summary judgment, respondent must "refer with particularity to those portions of the record upon which the non-movant relies"; all material facts "will be deemed undisputed unless *specifically controverted*" (emphasis added)). The same goes for Plaintiff's denials of UMFs 13, 14, and 17.

to his supervisor, then-Cabinet Secretary Tom Church. UMF 19;[3] ECF No. 34-1 at 9–13.

These itineraries and vouchers claimed a round trip from Plaintiff's home in Santa Fe to

San Diego, California, on October 20–24, 2018, and a separate round trip from Santa Fe

to Scottsdale, Arizona, on October 24–26, 2018. ECF No. 34-1 at 9. Plaintiff was

reimbursed the cost of four flights and mileage for two round trips between Santa Fe and

the Albuquerque airport. *Id*. In fact, however, the day after Plaintiff was reimbursed, he

canceled his reservation and rebooked his flights to travel directly from San Diego to

Scottsdale. *Id*. at 10. Therefore, Plaintiff did not return to the Albuquerque airport on

October 24, 2018, as represented by the submitted vouchers and itineraries. The change

in travel plans resulted in a total overpayment to Plaintiff of approximately $180. *Id*.

However, Plaintiff did not notify anyone of the overpayment or return the excess funds. In

addition, although Plaintiff originally submitted an airport parking receipt with no dates or

times listed, the OIG investigation uncovered a nearly identical airport parking receipt that

listed the dates and times of arrival and departure. *Id*. at 12. This discrepancy suggested

that someone had deliberately altered the receipt to make it look as though Plaintiff

traveled from Albuquerque to Santa Fe and back between his two trips, instead of leaving

his car parked at the airport for the duration.

Faced with this evidence, Plaintiff asserted that the overpayment was a clerical

error rather than an intentional fraud. ECF No. 34-2 at 5, 109:2–16. He also denied that

he instructed his assistant, Laura Hernandez, to alter the airport parking receipt. *See id*.;

---

[3] Plaintiff "denies the allegations" of UMF 19. ECF No. 39 at 4. However, based on the record, including Plaintiff's own deposition testimony and Response brief, all facts contained therein are undisputed except for the statement that "Plaintiff directed his assistant to alter a receipt." Plaintiff has not produced evidence to dispute the remaining facts. Because they are supported by the record and by Plaintiff's own admissions, the Court considers them undisputed.

ECF No. 42-1 at ¶ 18. Plaintiff acknowledged the change in travel plans and the overpayment and eventually repaid the $180 overpayment to the NMDOT. UMF 22; ECF No. 42-6.

On October 7, 2019, Secretary Sandoval issued a Notice of Contemplated Action ("NCA"), notifying Plaintiff that the NMDOT was considering his dismissal. ECF No. 34-1 at 1. As justification for his contemplated decision, Secretary Sandoval cited the following: Plaintiff's status as a high-level manager who should have known and abided by the rules; his concerns about Plaintiff's professionalism and fitness to supervise; Plaintiff's comments during his interview, which reflected a disregard of policies; the fact that Plaintiff altered his travel plans without approval and with resulting financial gain; and the fact that the parking receipt submitted with Plaintiff's Scottsdale voucher was altered to conceal his change in travel plans. ECF No. 34-1 at 5. The NCA also noted that neither Plaintiff's tenure with the NMDOT nor his subsequent repayment of $180 offset these concerns. *Id*.

In a letter dated October 18, 2019, Plaintiff's attorney responded to the NCA. UMF 31; ECF No. 34-9. The letter claimed, inter alia, that former Secretary Church had approved the change in Plaintiff's travel itinerary. UMF 32; ECF No. 34-9 at 1. Secretary Sandoval directed the OIG to confirm this with Mr. Church, but Mr. Church did not show up to his scheduled telephone interview or contact the NMDOT thereafter. UMF 37. At his deposition, Mr. Church testified that he remembered a phone call during which he verbally authorized Plaintiff to change his travel plans. UMF 39. However, this information was not provided to the OIG investigator. ECF No. 34-10 at 1, 74:8–9.

On October 29, 2019, Plaintiff received a Notice of Final Action ("NFA"), terminating his employment effective October 31, 2019. ECF No. 34-1 at 7. The NFA reiterated the reasons for termination set forth in the NCA; recited the OIG investigation findings, adding that the NMDOT had attempted unsuccessfully to interview Mr. Church; and informed Plaintiff that he could appeal his termination to the State Personnel Board. ECF No. 34-1 at 7–15, 22. Plaintiff did not file an appeal. UMF 48.

**Request for Family Medical Leave**

Plaintiff also asserts a claim for relief under the FMLA; the relevant facts are as follows. On or about March 13, 2019, approximately one month before the alleged whistleblowing and three months before the anonymous complaint, Plaintiff notified the NMDOT of his need to take Family Medical Leave ("FML") on an intermittent basis in order to care for his mother. ECF No. 34-12. The request was approved on April 2, 2019. *Id*. Plaintiff contemplated using two or three days of FML per week. ECF No. 34-2 at 21, 195:8–13. On or about July 17, 2019,[4] Plaintiff emailed Secretary Sandoval to notify him that he would shortly begin taking "two to three days a week" of FML as needed. *Id*. at 21, 196:20–25. Plaintiff did not receive a response. *Id*. at 22, 197:4–6.

That afternoon, Employee Relations Manager Geri Galvan and several other unidentified employees entered Plaintiff's office to deliver a letter notifying him that he was placed on paid administrative leave "effective immediately and until further notice,"

---

[4] In his Response brief, Plaintiff states that he sent the email on July 15, 2019. ECF No. 39 at 18. Plaintiff's original email is not in the record before the Court. However, Plaintiff clearly stated in his deposition testimony that he was placed on administrative leave "that afternoon [after sending the email]." ECF No. 34-2 at 22, 197:6. Because the letter placing Plaintiff on administrative leave was dated July 17, 2019, the Court infers that Plaintiff's email was also sent on that date. ECF No. 34-7. The exact date, in any event, is not material for purposes of this summary judgment motion.

pending an investigation. ECF No. 34-7. The terms of Plaintiff's administrative leave required him to "report to duty or otherwise respond" within two hours' notice between the hours of 8:00 a.m. and 5:00 p.m., Monday through Friday. *Id.*

On Tuesday, October 15, 2019, Plaintiff was contacted to report to an "emergency meeting" within approximately two hours. ECF No. 34-1 at 15. Plaintiff stated that he would not be available until Thursday, October 17. *Id.*; ECF No. 34-5 at 4, 18:1–6. He was placed on "AWOL status." ECF No. 34-1 at 15. However, when Plaintiff subsequently explained that he was unable to attend because he was taking care of his mother, his status was reclassified as paid administrative leave. ECF Nos. 34-1 at 15; 34-2 at 24, 205:12–16; 34-5 at 4, 18:7–17. Plaintiff remained on paid administrative leave until his termination.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once that threshold is met, the nonmoving party must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324. In applying the summary judgment standard, the court "view[s] the evidence and the reasonable inferences to be

drawn from the evidence in the light most favorable to the nonmoving party." *Parker Excavating, Inc. v. Lafarge W., Inc.*, 863 F.3d 1213, 1220 (10th Cir. 2017) (citation omitted).

**DISCUSSION**

I.      **FMLA Claim**

The Court turns first to Plaintiff's federal claim. Pursuant to the FMLA, it is unlawful for an employer (1) "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" under the FMLA; or (2) "to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. 29 U.S.C. § 2615(a)(1)–(2). The Tenth Circuit recognizes two theories of recovery under § 2615(a): "an entitlement or interference theory arising from § 2615(a)(1), and a retaliation or discrimination theory arising from § 2615(a)(2)." *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006). "These two theories of recovery are separate and distinct theories that require different showings, differ with respect to the burden of proof, and differ with respect to the timing of the adverse action." *Dalpiaz v. Carbon Cnty*, 760 F.3d 1126, 1131 (10th Cir. 2014) (quotation and alterations omitted).

a.  *Nature of Plaintiff's Claim*

The preliminary question to be settled is whether Plaintiff's FMLA claim proceeds under § 2615(a)(1) or § 2615(a)(2). In Count II of the Complaint, Plaintiff alleges that "Defendant retaliated against Plaintiff for exercising his right to FMLA leave . . . by terminating him." ECF No. 1-1 at ¶¶ 29–30. In his Response brief, however, Plaintiff characterizes his claim as "an interferance [sic] FMLA claim" and alleges that "once he was put on administrative leave, it interfered with plans to take leave." ECF No. 39 at 18.

It appears, therefore, that Plaintiff originally pled a claim of retaliation under § 2615(a)(1) but now wishes to pursue a theory of relief under § 2615(a)(2).

Plaintiff was not entitled to alter his FMLA claim without seeking leave of the Court to amend his Complaint. *See Dalpiaz*, 760 F.3d at 1131–32 (refusing to consider an untimely retaliation argument when only an FMLA interference claim was originally pled). Although both originate from the same statute, retaliation and interference claims are not equivalent. *Id*. at 1131. The federal pleading standard does not "permit plaintiffs to wait until the last minute to ascertain and refine the theories on which they intend to build their case." *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1091 (10th Cir. 1991); *see also Orr v. City of Albuquerque*, 417 F.3d 1144, 1153 (10th Cir. 2005) (district court's refusal to consider a new claim on summary judgment was not an abuse of discretion where "the burden on Defendants" was "sufficiently different" for defending the new claim).

Nothing in Plaintiff's Complaint indicated an intent to pursue a claim of interference under § 2615(a)(1). *See generally* ECF No. 1-1. At no point during the intervening ten months of litigation did Plaintiff seek leave to amend. Because Defendant was not put on notice of an interference claim, and because the two different claims involve significantly different elements and burdens of proof, allowing Plaintiff to alter his claim at this juncture would unfairly prejudice Defendant. The Court therefore declines to consider Plaintiff's § 2615(a)(1) claim for interference, and will analyze only his § 2615(a)(2) claim for retaliation.

### b. *FMLA Retaliation*

Courts apply the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to FMLA retaliation claims without direct evidence. Under the

*McDonnell Douglas* framework, the plaintiff must first make a prima facie showing that

"(1) [h]e engaged in a protected activity; (2) [the employer] took an action that a

reasonable employee would have found materially adverse; and (3) there exists a causal

connection between the protected activity and the adverse action." *Metzler*, 464 F.3d at

1171. If the plaintiff succeeds in establishing a prima facie claim, the burden shifts to the

employer to "offer a legitimate, non-retaliatory reason for the employment action." *Id.* at

1170. Finally, at the third step, the plaintiff "bears the ultimate burden of demonstrating

that the defendant's proffered reason is pretextual." *Id*. In the absence of any direct

evidence of retaliation,[5] the Court considers Plaintiff's proffered evidence under this

burden-shifting framework.

On the prima facie inquiry, the Court finds that (1) Plaintiff's exercise of FML

constituted protected activity, and (2) Plaintiff's termination was a materially adverse

employment action.[6] However, Plaintiff has failed to make the requisite showing of a

---

[5] "Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007) (quotation omitted). The Court finds without difficulty that no such evidence exists here, and Plaintiff does not oppose Defendant's application of the *McDonnell Douglas* framework to his claims. *See generally* ECF No. 39.

[6] Plaintiff has *not* alleged that Defendant retaliated against him by placing him on paid administrative leave. *See* ECF No. 1-1 at ¶ 30. Indeed, Plaintiff testified at his deposition as follows:

> Q: Are you saying that it was—that the investigation and the administrative leave were a ruse to deprive you of FMLA?

> A: I think they had this investigation premeditated to begin with. I think they were getting ready to act on it. Unfortunately, when I had submitted for them, I had submitted my FMLA request, that was the day they had to do it. Because they know if they would have granted me any administrative leave, thereafter that would open up a bigger can of worms for the DOT. So I think they acted on it immediately. I don't think they were going to give me that Letter of Contemplated—or that letter of dismissal, whatever, that day. **I think they were going to wait till probably that Friday.** But since I had already put in that request, they fast-tracked it through so that I wouldn't have any FMLA to come back on.

ECF No. 34-2 at 22, 199:5–18 (emphasis added). As this testimony demonstrates, Plaintiff appears to acknowledge that Defendant's plan to place him on administrative leave predated his notice of intent to take FML.

causal connection between the two events. Plaintiff announced an intention to use his approved FML on July 17, 2019. He was not terminated until October 29, 2019. ECF No. 34-1 at 7. This more than three-month gap, standing alone, is insufficient to establish causation by temporal proximity. *See Anderson v. Coors Brewing Corp.*, 181 F.3d 1171, 1179 (10th Cir. 1999) ("[W]e have held that a three-month period, standing alone, is insufficient to establish causation."). Where "a considerable length of time has elapsed between a protected activity and an adverse employment action, a plaintiff wishing to survive summary judgment must present additional evidence tying the adverse employment actions to the plaintiff's protected activity." *Foster v. Mt. Coal Co., LLC*, 830 F.3d 1178, 1191 (10th Cir. 2016) (quotation and alteration omitted). Plaintiff has not argued that any other evidence supports a causal inference between his notice to Secretary Sandoval and his termination, and no such evidence is apparent on the record. Therefore, summary judgment is appropriate in favor of Defendant.[7]

---

[7] Even assuming, arguendo, that Plaintiff had succeeded in establishing a prima facie case, his retaliation claim would fail at the third step because he cannot demonstrate that Defendant's proffered non-retaliatory reason for termination was pretextual. *See Metzler*, 676 F.3d at 1172 (to defeat summary judgment, plaintiff "must show that there is a genuine dispute of material fact as to whether [the defendant's] explanations for terminating [his] employment are pretextual"). Plaintiff has not, for example, come forward with evidence of differential treatment for any "similarly-situated employees who violated work rules of comparable seriousness." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000). Testimony by Mr. Church and former Director Ron Baca that they were not "aware" of other employees being terminated for travel voucher violations is largely immaterial. *See* ECF Nos. 39-1 at 2; 39-1 at 10, 125:7–12. Both Mr. Church and Mr. Baca left the NMDOT before Secretary Sandoval became Plaintiff's supervisor. *See Aramburu*, 112 F.3d at 1404 ("Similarly situated employees are those who deal with the same supervisor . . . ."). Plaintiff has come forward with no specific comparators.
    Likewise, the facts that someone removed Plaintiff's sign from his office door; that former Secretary Church did, unbeknownst to Secretary Sandoval, verbally approve the change in travel plans; and that Plaintiff had no former disciplinary history do not demonstrate that Defendant's stated reasons for termination were pretextual.
    However, because Plaintiff's prima facie claim fails at the third stage, the Court need not and does not here conduct a full analysis of pretext.

II.      **Remand of State Law Claim**

With summary judgment granted on Plaintiff's federal claim, only his state law WPA

claim remains. Defendant urges the Court to continue to exercise supplemental

jurisdiction pursuant to 28 U.S.C. § 1367. ECF No. 42 at 2 n.1. The Court finds, however,

that Plaintiff's state law claim is more appropriately resolved in the courts of the State of

New Mexico.

"If federal claims are dismissed before trial, leaving only issues of state law, the

federal court should decline the exercise of jurisdiction by dismissing the case without

prejudice." *Bauchman v. West High Sch.*, 132 F.3d 542, 549 (10th Cir. 1997).

Nevertheless, the district court has discretion to retain its jurisdiction over state law claims

and should consider "the values of judicial economy, convenience, fairness, and comity"

in determining whether to do so. *Henderson v. AMTRAK*, 412 F. App'x 74, 79 (10th Cir.

2011).

Although the Court is sympathetic to Defendant's arguments about judicial

economy, convenience, and fairness, the Court nevertheless finds that Plaintiff's WPA

claim raises several unsettled questions of state law that are better addressed by a

New Mexico court. Because, here, considerations of comity support the usual approach

of declining to exercise supplemental jurisdiction, the Court will remand the action to state

court.

## CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment (ECF

No. 34) is **GRANTED IN PART**. The Court **GRANTS** summary judgment in Defendant's

favor on Count II of the Complaint ("Retaliation Under the FMLA"). Plaintiff's remaining

state law claim is **REMANDED** to the Second Judicial District Court, County of Bernalillo,

State of New Mexico. The Clerk of Court is directed to take the necessary actions to

remand the case.

      **IT IS SO ORDERED.**

**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE